DECISION
{¶ 1} Relator, Caraustar Industries, Inc., commenced this original action requesting a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its order granting permanent total disability ("PTD") compensation to respondent, Florence E. Terry ("claimant"), and to enter an order denying said compensation.
 {¶ 2} Pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals, this matter was referred to a magistrate who issued a decision, including findings of fact and conclusions of law. (Attached as Appendix A.) In his decision, the magistrate determined that there was some evidence to support the commission's finding that claimant's medical impairment resulted from the allowed conditions and prohibited claimant from all sustained remunerative employment. Therefore, the magistrate recommended that the writ of mandamus be denied.
 {¶ 3} Relator filed objections to the magistrate's decision, arguing that Dr. Ward relied upon a non-allowed condition — lumbar rediculopathy — in reaching his disability assessment. We disagree. Although Dr. Ward arguably references a non-allowed condition in his report as part of his overall evaluation of claimant, his opinion is expressly based on the allowed conditions. Therefore, Dr. Ward's report constitutes some evidence upon which the commission could rely in awarding claimant PTD compensation.
 {¶ 4} Following an independent review of this matter, we find that the magistrate has properly determined the pertinent facts and applied the appropriate law. Therefore, we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained therein. In accordance with the magistrate's decision, we deny the requested writ of mandamus.
Objections overruled; writ of mandamus denied.
BRYANT and SADLER, JJ., concur.
 DECISION IN MANDAMUS {¶ 5} In this original action, relator, Caraustar Industries, Inc., requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order granting permanent total disability ("PTD") compensation to respondent Florence E. Terry, and to enter an order denying said compensation.
Findings of Fact:
 {¶ 6} 1. Florence E. Terry ("claimant") has sustained three industrial injuries while employed with relator, Caraustar Industries, Inc. ("Caraustar"). Claimant's March 18, 1996 injury is allowed for: "contusion lower leg, right; contusion and hematoma left leg," and is assigned claim number 96-481452. Her March 1, 1997 injury is allowed for: "lumbosacral sprain," and is assigned claim number 97-330533. Her August 29, 1997 injury is allowed for: "laceration of right hand; multiple contusion to knees, hand and wrists; rotator cuff tear right shoulder; fracture right wrist; fracture 5th and 6th ribs on left side," and is assigned claim number 97-503219.
 {¶ 7} 2. Claimant has not worked since the date of her third industrial injury, i.e., August 29, 1997.
 {¶ 8} 3. On November 17, 2000, claimant filed an application for PTD compensation. In support, claimant submitted a report from orthopedic surgeon Richard M. Ward, M.D., who examined claimant on October 23, 2000. After listing the dates of injury, the industrial claim numbers, and the allowed conditions of each claim, Dr. Ward wrote:
 {¶ 9} "By history, on 8-13-96 she was working in a factory. On that date she pulled a skid from an overhead slot and it fell and injured both of her legs. She did develop a blood clot in the left leg. At the same job, on 1-3-97 she was operating a machine and she fell backwards and hurt her lower back. Again, at the same job, on 8-29-97, she was in the parking lot and stepped in a hole and fell. She injured her right shoulder, her left hand, she had a fracture in her right wrist and she hurt both of her knees. She last worked on the date on this injury (8-29-97). She has not been able to return to work since. In September of 1997 she underwent surgery to the right shoulder to decompress it and repair a torn rotator cuff tendon. Unfortunately, the surgery was not successful and she has continued to have pain and marked loss of motion in her right shoulder. She, unfortunately, is right handed.
 {¶ 10} "At the present time she has tenderness in her left calf at the site of the blood clot. She has pain in her right knee aggravated by weight bearing and twisting, she can't kneel, squat or crawl, she has to go up and down stairs one at a time. She has constant pain in the lower portion of her back, more severe on the right side. The pain radiates into the posterior right buttock. Her low back symptoms are aggravated by bending, lifting, twisting, she can only sit for about ½ hour and stand in one position for two minutes. She notes marked weakness in her dominant right hand, this is unfortunate because she had a prior problem with her left hand that occurred about eight years ago and was secondary to a cervical spine problem. She cannot use her left hand for much of anything, she was able to work because she could use her right hand, now she can't really use her right hand effectively.
 {¶ 11} "She denies ever having had problems with her leg prior to 8-13-96, with her lower back prior to 3-1-97 or with her right shoulder and her right wrist and her right knee prior to the injury on 8-29-97.
 {¶ 12} "She is 5' 7" tall, weighs 140 lbs. She takes pills for an elevated blood pressure. On examination she has pain in the lower portion of her back that spreads to involve the posterior left buttock, she has involuntary muscle spasm with loss of lumbar spine motion. With her pelvis stabilized she cannot hyperextend beyond neutral, she has 30 degrees of forward flexion, 15 degrees of right tilt and 10 degrees of left tilt. Both knee jerks are equal at a trace, both ankle jerks are equal at a trace. Straight leg raising is painful on the right side at 50 degrees and on the left side at 60 degrees, sensation in both legs is intact. She has marked tenderness on the medial side of the left calf at the site of the blood clot, she has pain in the right side with crepitus. She has a range of motion from 0 to 120 degrees of flexion, the ligaments are stable. The left thigh circumference is down by 1 ½ inches when compared to the right, the left calf circumference is down by ½ inch when compared to the right. She has Grade 4 weakness of both flexion and extension power to the left knee because of the thigh muscle atrophy. She has pain in the right shoulder with marked limitation of right shoulder motion, she has 30 degrees of flexion, 30 degrees of abduction, 10 degrees of internal rotation and 20 degrees of external rotation. Using the dynamometer, she has 6 kg. of grip strength in her dominant right hand. From the 4th [E]dition of the AMA Guidelines, Table 32, normal grip strength for a female in her age group in the dominant right hand should be 22 kg.
 {¶ 13} "Based on the history and my examination, I believe she was injured on the three occasions discussed above. As a result of the injuries she has marked limitation of motion in her right shoulder, marked weakness of grip strength in her right hand. She has pain in her right knee and in her left leg, she is very limited in her ability to be on her feet. She has to go up and down stairs one at a time, she can't squat, kneel or crawl. She continues to have pain in her lower back with muscle spasms and stiffness. Taking into account all of these problems, it is obvious to me that she is not capable of sustained gainful employment and should be considered permanently and totally disabled. I have filled out a physical capacities evaluation taking into account the allowed conditions from the three injuries discussed above."
 {¶ 14} 4. In further support, claimant submitted a report, dated July 12, 1999, from Pradip M. Vyas, M.D., stating:
 {¶ 15} "Mrs. Florence Terry had a torn right rotator cuff and has undergone surgical repair, but it has failed to help the patient. At present time she can barely raise her right upper extremity and has very little power to use her right hand. The patient is unable to do any job which involves the right hand, because she can not use it. Unfortunately this patient is a right handed person and that makes her quite disabled to perform any gainful job. * * *"
 {¶ 16} 5. On April 6, 2001, claimant was examined at Caraustar's request by David C. Randolph, M.D. Dr. Randolph's report, dated May 3, 2001, states:
 {¶ 17} "Based upon the allowed conditions in Claim #96-481452, #97-330533 and #97-503219 it is my opinion this claimant is capable of returning to her former position of employment as an inspector/operator with Federal Packaging. There is nothing in the objective record to indicate exactly why this claimant has been kept off work for such a prolonged period of time, however it clearly has nothing to do with the conditions allowed in any of these three referenced claims. A review of the objective tests pertaining to her low back clearly indicate that her ongoing subjective complaints and treatment is not being directed toward the conditions allowed in any of these claims (other than her shoulder complaints which again are poorly corroborated).
 {¶ 18} "It is my opinion that her continued absence from work is not related to the conditions allowed in this claim and she is certainly capable of returning to sustained remunerative employment based upon the conditions allowed in these claims. It is to be noted that with the exception of her right shoulder complaints and the fracture of her right wrist and ribs the remainder of these allowed conditions are all of a soft tissue nature which would have long ago resolved without sequela.
 {¶ 19} "* * *
 {¶ 20} "As outlined above in my opinion this claimant is a poor candidate for sustained remunerative employment. This is not however based upon the allowed conditions of the referenced industrial injuries but rather upon unrelated conditions due to natural deteriorative processes involving various parts of her body."
 {¶ 21} 6. On May 18, 2001, claimant was examined at the commission's request by Jeffrey L. Mikutis, D.O., who wrote:
 {¶ 22} "The claimant has a total of a 27% whole person impairment based on the allowed claims. This is based on allowance of 16% whole person impairment based on her right shoulder rotator cuff tear with decreased range of motion. For her lumbar spine condition, she has a DRE Lumbosacral Category II which is a 5% whole person impairment. For her right wrist decreased range of motion, she has an 8% whole person impairment. For her ribs, multiple contusions and abrasions, in each of these categories she has a 0% whole person impairment."
 {¶ 23} 7. Dr. Mikutis also completed a physical strength rating form dated May 18, 2001. On this form, Dr. Mikutis indicated that "[t]his claimant is not capable of physical work activity."
 {¶ 24} 8. On March 12, 2002, Caraustar deposed Dr. Mikutis. The deposition was recorded and transcribed for the record.
 {¶ 25} 9. Following a May 14, 2002 hearing, a staff hearing officer ("SHO") mailed a "corrected" order on July 19, 2002 that grants claimant's PTD application. The SHO's corrected order states:
 {¶ 26} "It is the finding of the Staff Hearing Officer that the claimant is permanently and totally disabled.
 {¶ 27} "The Staff Hearing Officer relies upon the persuasive medical reports of Drs. Jeffrey Mikutis, D.O. (05/18/2001), Richard M. Ward, (10/23/2000) and Pradip M. Vyas (07/12/1999). The reports supports [sic] the conclusion that the allowed medical conditions in this claim in and of themselves render the claimant permanently and totally disabled from engaging in any type of sustained remunerative employment.
 {¶ 28} "Where the medical evidence on which the Commission is relying supports a conclusion that the claimant is incapable of performing even sedentary work, there is no need to consider or to discuss the non-medical disability factors. Since it is the finding of the Staff Hearing Officer that the allowed conditions in this claim have on a medical basis rendered the claimant permanently and totally disabled from engaging in any sustained remunerative employment, the Staff Hearing Officer does not find it neces-sary to consider or to discuss the claimant's non-medical disability factors of age, edu-cation, and prior work experience. State, ex rel. Speelman v. Indus. Comm. (1992), 73 O.App.3d 757; State, ex rel. Libbey-Owens Ford Co. v. Indus. Comm. (1991), 62 Ohio St.3d 6; State, ex rel. Hartung v. Indus. Comm. (1990),53 Ohio St.3d 257; State, ex rel. Stephenson v. Indus. Comm. (1987),31 Ohio St.3d 167[;] State, ex rel. Eaton Corp. v. Indus. Comm. (1997),80 Ohio St.3d 352. (Emphasis sic.)
 {¶ 29} "The start date of the payment of the Permanent and Total Disability Compensation is 10/23/2000. The Staff Hearing Officer chooses this date because it is the date of the persuasive report of Dr. Richard M. Ward."
 {¶ 30} 10. On November 6, 2002, relator, Caraustar Industries, Inc., filed this mandamus action.
Conclusions of Law:
 {¶ 31} The issue is whether the commission relied upon some evidence to support its finding that the medical impairment resulting from one or more allowed conditions of the three industrial claims prohibits all sustained remunerative employment without reference to the vocational factors.
 {¶ 32} The commission's corrected order states reliance upon the May 18, 2001 report of Dr. Mikutis, the October 23, 2000 report of Dr. Ward, and the July 12, 1999 report of Dr. Vyas.
 {¶ 33} Because the October 23, 2000 report of Dr. Ward constitutes some evidence upon which the commission can rely to support PTD compensation, it is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.
 {¶ 34} Ohio Adm. Code 4121-3-34(D) sets forth the commission's guidelines for the adjudication of PTD applications. Ohio Adm. Code4121-3-34(D)(2)(a) states:
 {¶ 35} "If, after hearing, the adjudicator finds that the medical impairment resulting from the allowed condition(s) in the claim(s) prohibits the claimant's return to his former position of employment as well as prohibits the claimant from performing any sustained remunerative employment, the claimant shall be found to be permanently and totally disabled, without reference to the vocational factors * * *."
 {¶ 36} In State ex rel. Speelman v. Indus. Comm. (1992),73 Ohio App.3d 757, 762, this court set forth "several scenarios" to guide the commission in its adjudication of PTD applications. This court stated:
 {¶ 37} "* * * If there is some evidence upon which the commission specifically relies that a claimant is medically unable not only to return to his former position of employment but to perform any sustained remunerative employment, all as a result of the allowed condition, it is unnecessary that the commission look at any further factors, such as Stephenson [State ex rel. Stephenson v. Indus. Comm. (1987), 31 Ohio St.3d 167] factors, and an order allowing permanent total disability compensation should be entered. State ex rel. Galion Mfg. Div., Dresser Industries, Inc. v. Haygood (1991), 60 Ohio St.3d 38
* * *."
 {¶ 38} A claimant must always show the existence of a direct and proximate causal relationship between his or her industrial injury and the claimed disability. State ex rel. Waddle v. Indus. Comm. (1993),67 Ohio St.3d 452. Non-allowed medical conditions cannot be used to advance or defeat a claim for compensation. Id.
 {¶ 39} The mere presence of a non-allowed condition in a claim for compen-sation does not in itself destroy the compensability of the claim, but the claimant must meet her or his burden of showing that an allowed condition independently caused the disability. State ex rel. Bradley v. Indus. Comm. (1997), 77 Ohio St.3d 239, 242.
 {¶ 40} The underlying theory of relator's challenge to the medical evidence relied upon by the commission is that Drs. Mikutis, Ward, and Vyas relied upon non-allowed conditions in rendering their disability opinions. Relator's theory advanced here largely follows the theory and evidence contained in Dr. Randolph's report which the commission apparently rejected. Relator emphasizes the "diagnostic testing" of record. For example, an MRI performed on May 16, 2000 revealed degenerative disc disease in claimant's spine. An X-ray report dated September 2, 1997 discloses:
 {¶ 41} "* * * Narrowing of the joint space between the distal epiphysis of the right femur and the posterior surface of the right patella compatible with degenerative disease."
 {¶ 42} According to relator, "the first level of inquiry" in this mandamus action is whether Dr. Mikutis' reports and his deposition testimony provide some evidence that claimant's inability to work is causally related to the industrial injury. (Relator's brief at 9.)
 {¶ 43} According to relator, Dr. Mikutis' deposition testimony discloses that Dr. Mikutis' disability opinion is premised in part on non-allowed conditions. In his deposition, Dr. Mikutis indicated that claimant's disability is caused in part by sleep deprivation that results from pain. Later, Dr. Mikutis testified that he could not say that claimant's pain disrupting sleep is produced only by her allowed industrial conditions.
 {¶ 44} Relator also challenges the report of Dr. Vyas as being too conclusory in nature. According to relator, there was no basis for Dr. Vyas to conclude that claimant is "quite disabled to perform any gainful job" from the impairment in her right upper extremity. (Reply brief at 5-6.)
 {¶ 45} Given the magistrate's finding that Dr. Ward's October 23, 2000 report constitutes some evidence to support PTD, relator's challenges to the reports of Drs. Mikutis and Vyas are largely irrelevant. State ex rel. Galion Mfg. Div. Dresser Industries, Inc. v. Haygood (1991), 60 Ohio St.3d 38[1].
 {¶ 46} Relator seems to only indirectly challenge Dr. Ward's report here. Relator suggests that Dr. Ward's report must be viewed, and thus reviewed, by this court in light of all the medical evidence of record. According to relator, if this court were to review Dr. Ward's report in light of Dr. Vyas's treatment of claimant's degenerative disc disease and lumbar radiculopathy, it would conclude that Dr. Ward's opinion is premised upon non-allowed conditions. (Relator's brief at 3.)
 {¶ 47} Relator also criticizes the commission for what it calls an "isolated review of the medical evidence." According to relator, the commission abused its discretion when it relied upon "limited evidentiary items without taking into consideration the combined and cumulative effect of the evidence as a whole." (Relator's brief at 12.) Relator's criticism of the commission is simply an invitation that this court conduct a de novo review of the medical evidence and, in effect, reweigh the evidence in mandamus. This court ordinarily does not conduct such a review in mandamus.
 {¶ 48} Contrary to relator's invitation, this court need not review Dr. Ward's report in light of other evidence of record. Dr. Ward's report must stand on its own in the determination of whether it constitutes some evidence to support PTD.
 {¶ 49} Dr. Ward examined relator. Dr. Ward correctly listed the allowed conditions of each industrial claim. Again, Dr. Ward wrote:
 {¶ 50} "Based on the history and my examination, I believe she was injured on the three occasions discussed above. As a result of the injuries she has marked limitation of motion in her right shoulder, marked weakness of grip strength in her right hand. She has pain in her right knee and in her left leg, she is very limited in her ability to be on her feet. She has to go up and down stairs one at a time, she can't squat, kneel or crawl. She continues to have pain in her lower back with muscle spasms and stiffness. Taking into account all of these problems, it is obvious to me that she is not capable of sustained gainful employment and should be considered permanently and totally disabled. I have filled out a physical capacities evaluation taking into account the allowed conditions from the three injuries discussed above."
 {¶ 51} Nothing could be clearer. Dr. Ward opined that claimant "is not capable of sustained gainful employment and should be considered permanently and totally disabled." He directly attributed this disability to the three industrial injuries. The commission relied on this opinion as it was within its fact-finding discretion to do. There is nothing in Dr. Ward's report to suggest that Dr. Ward relied, even in part, upon non-allowed conditions in rendering his disability opinion.
 {¶ 52} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.
[1] In Galion, the employer directed its sole challenge to Dr. Lyon's report. The court noted that the employer ignored the commission's additional reliance upon Dr. Retter's reports. The court found that Dr. Retter's reports alone supported the PTD award.